IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF YOHANNA G. ET AL.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF YOHANNA G. ET AL., CHILDREN UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

MAHDIA G., APPELLANT.

Filed April 25, 2023.    Nos. A-22-539 through A-22-541.

Appeals from the County Court for Dawson County: JEFFREY M. WIGHTMAN, Judge. Affirmed.

Bronson J. Malcom, of Malcom, Nelsen & Windrum, L.L.C., for appellant.

R. Garrett Goodwin, Deputy Dawson County Attorney, for appellee.

RIEDMANN, BISHOP, and WELCH, Judges.

RIEDMANN, Judge.

## INTRODUCTION

Mahdia G. appeals the decision of the Dawson County Court, sitting as a juvenile court, terminating her parental rights to her minor children: Yohanna G., born in 2015, Galla G., born in 2016, and Arsema N., born in 2019. Following our de novo review of the record, we find clear and convincing evidence establishing statutory grounds for termination, proving that Mahdia was unfit, and showing that termination of her parental rights were in the children's best interests. We therefore affirm.

## BACKGROUND

On February 7, 2020, the Nebraska Department of Health and Human Services (DHHS) responded to a report from the Illinois DHHS that a child had been denied medical care. The child

- 1 -

was not one of Mahdia's children; however, when workers from the Nebraska DHHS and law enforcement arrived at the reported home in Lexington, Nebraska, they discovered that 12 children, belonging to 3 families, lived in the two-bedroom house.

The house was dirty and unsanitary. It was covered in trash, urine, and grime. The children were eating out of the trash can and eating old food that was left out. Beer bottles containing varying amounts of beer were scattered throughout the home. The children were in soiled diapers. All 12 children, including Mahdia's children, were removed from the home and taken to the hospital to be evaluated. Mahdia's youngest child, Arsema, was treated for influenza and Respiratory Syncytial Virus, which can cause respiratory tract infections.

This case addresses only Mahdia's parental rights. Nase A.G. is Arsema's father. Both of the older boys have different fathers. None of the three fathers have participated in the case. Although Nase appeared for the adjudication hearing and a May 2020 review hearing, he moved out of the state in May and DHHS was unable to contact him again. Thus, the fathers will only be discussed when necessary. Mahdia speaks only Kunama, which is a language originating from Eritrea. Interpreter services were provided to her throughout the duration of the case.

The juvenile court granted DHHS temporary custody and placement of the children, pending a placement hearing, based on an affidavit submitted by the State during an ex parte hearing. A guardian ad litem (GAL) was appointed for the children. The juvenile court also appointed the children with court appointed special advocates. At the adjudication hearing, both Mahdia and Nase entered no contest admissions. The juvenile court noted that the issues in the case should be "easily remediable" and ordered visitation.

*Children Returned to Mahdia's Care.*

On March 19, 2020, the children were returned to Mahdia, but DHHS maintained legal custody over them. Mahdia had made progress since the children were removed, as the house was clean and the children were being properly fed, bathed, and tended to regularly. Although there was progress, it was still noted that Mahdia needed to provide better supervision. There were also concerns about Mahdia's ability to provide for the children's basic needs, because in April alone, Mahdia needed assistance with paying rent and the electric bill, as well as assistance with food.

In May 2020, Mahdia reported to DHHS that Nase had moved out. She suggested to her attorney that she was considering moving to Des Moines, Iowa, because Des Moines was home to the Kunama Association of North America and it is where she had a stronger support system. Mahdia also requested that DHHS provide more assistance. Since Nase was not there to help, she needed childcare help and additional financial support. Family support helped Mahdia fill out paperwork for SNAP benefits and a childcare subsidy. Mahdia missed the phone call for the childcare subsidy, and it was later discovered that Nase had not moved out, which disqualified them from SNAP benefits.

Two days before the first review hearing, police responded to an altercation at Mahdia's house. Nase was reportedly intoxicated and wielding a knife. Mahdia and the children were found outside of the home in the middle of the night. No arrests were made.

At the first review hearing, Mahdia explained that her lack of transportation and childcare created issues for her, and having more support around her could alleviate many of these issues. Mahdia's caseworker, Paula Degenhardt, discussed the Interstate Compact for Placement of

Children (ICPC) process, which would allow Mahdia's children to be placed with a family friend named Hana Batista if Mahdia decided to move to Iowa. Batista operated a licensed daycare out of her house and would be willing to house Mahdia and the children while Mahdia got settled. Mahdia, Yohanna, and Galla had lived with Batista for an 8-month period before moving to Lexington.

The juvenile court discussed the implications of the ICPC process and adopted DHHS' suggested case plan goals. The adopted case plan goals for Mahdia were to provide safe and appropriate housing; to develop an understanding of her children's medical needs; to attain a better understanding of child development by providing age-appropriate learning opportunities and working with community providers; and develop a better understanding of their children's nutritional needs. It also acknowledged that language barriers complicated the case, but the Covid-19 pandemic made it even more difficult.

Sometime after the review hearing, Nase officially moved out of the family home. His whereabouts were unknown. Although DHHS tried to reach out to him, they were not able to contact him for the remainder of the case.

*Children Removed Again.*

Mahdia had been using childcare that DHHS had arranged for her. The childcare center agreed to open early so that Mahdia could drop off the children and still make it to work on time. Mahdia told Degenhardt that she had dropped off medication for Yohanna but had left it at the center for a few days, and when Mahdia attempted to use the medication, a visitation provider reported she did not appear to know how to properly administer it. This instigated the concern for Mahdia not providing adequate medical attention to her children.

On June 19, 2020, the children were removed from the home again and put in respite care for a 10-day period. The main justification for placing the children in respite care was a fear that Mahdia was not providing the right medication to the children.

While the children were in respite care, DHHS learned that the childcare center would no longer accommodate Mahdia because the children were not consistently attending daycare. Mahdia was not taking the children to daycare because she was on leave from her job. Degenhardt testified that leading up to the second removal, Mahdia often told DHHS that she did not have food for the children, despite DHHS providing her with resources for food banks and similar organizations. While the children were in respite care, Mahdia's electricity was shut off for failure to pay her electricity bill. The children were officially removed from Mahdia's physical custody on June 30, 2020.

After the children were removed from the home the second time, DHHS was limited to using video calls for visits when there were concerns that Mahdia was exposed to Covid-19. However, Mahdia refused to participate in the video calls. When in-person visits did occur, it was noted that Mahdia spent a lot of her visitation time on her phone and did not properly supervise the children. There were also times when the visitation provider would have to redirect Mahdia because she was not disciplining or parenting her children.

By August 2020, Mahdia had stopped participating in family support meetings. Both DHHS and the GAL were concerned with Mahdia's mental health, because she indicated during family meetings that she would harm herself or others. Mahdia exhibited an "explosive temper"

during family meetings and would yell at her family support team when she was frustrated. DHHS noted this could be a potential barrier to reunification because it became difficult to communicate with Mahdia when she reacted in this manner. Although DHHS requested a mental health evaluation, the juvenile court decided it would order one only if Mahdia was willing to undergo the evaluation. When Mahdia refused, the juvenile court denied DHHS' request for a mental health evaluation.

The family support team began discussing the ICPC process in August 2020. It discovered Mahdia could not qualify for an expedited ICPC request. The family support team suggested it may be better if Mahdia moved into Batista's first, then bring the children to Iowa after Mahdia got settled. It was also suggested that the juvenile case could be transferred, so the children could be placed in a foster home nearby. Mahdia was apprehensive of moving to Iowa without her children because she did not want to leave them.

At the review hearing on September 4, 2020, Degenhardt described the continued barrier to reunification was Mahdia's struggles with her finances, especially after Mahdia was fired from her employment. The juvenile court encouraged DHHS to move quicker in getting the children involved in overnight and semi-supervised visitation. It also noted that DHHS needed to get the ICPC process started because moving to Iowa appeared to be in the family's best interests, especially if it led to more employment opportunities for Mahdia since she only spoke Kunama.

*Mahdia's Motion to Dismiss.*

On October 23, 2020, a hearing was held on Mahdia's motion to dismiss. During the hearing, Degenhardt testified that Mahdia had moved to Iowa the week before, which was 2 weeks after she had begun semi-supervised visitation. The ICPC request had been denied because Batista lived with two of her adult children who failed to sign background check releases. Despite the denial, Mahdia moved to Des Moines because of an altercation with her roommate in Lexington, which had led to law enforcement being called to the house to diffuse the situation.

Mahdia filed the motion to dismiss so that the children could be released into her custody, and they could live with her in Iowa. Degenhardt testified DHHS' position was that due to lack of progress in the case plan goals, it would not support the children living with Mahdia at that time. Degenhardt also referred to a report she received during the ICPC process, which provided that the Iowa DHHS equivalent had investigated Mahdia for child abuse and neglect in 2018. The report showed founded claims of improper supervision of children. She explained the report mirrored the problems they were having with Mahdia in the present case. During visits, Mahdia often used her phone and had to be reminded to stay close to her children when they wandered.

The juvenile court ultimately denied Mahdia's motion to dismiss. It explained that this was a frustrating case and Mahdia would likely do better in Iowa, but there were not adequate safety protocols in place for the children. It emphasized that DHHS needed to resubmit the ICPC process immediately. The second ICPC request for Batista's residence was filed on October 30, 2020.

*Mahdia's Progress in Iowa.*

During November 2020, Mahdia was still trying to get a job in Des Moines. When Degenhardt tried to follow up with her about the job, Mahdia told her that she would withhold any employment information until DHHS let the children move to Iowa. Since Mahdia's move to Iowa,

all of her visits were through phone calls, which did not last long, as it was difficult to keep the children's attention and engage them over the phone. Although DHHS offered to coordinate visits with Mahdia for her to see the children in Lexington, Mahdia told DHHS she would not visit unless she was guaranteed overnight visits with the children.

At the review hearing on November 20, 2020, Mahdia clarified that she would be starting a job the following week. DHHS also raised numerous concerns in its report to the juvenile court. It noted that there were concerns that Mahdia would not be able to meet the children's basic needs and she did not have adequate parenting skills. Mahdia was no longer participating in family support meetings, and there was a growing concern about Mahdia's mental health and cognitive ability. During the August to November review period, Mahdia made multiple comments that she would commit self-harm or harm others. The juvenile court ordered another 3-month review, but reassured Mahdia that the ICPC request could be approved before that hearing.

In January 2021, DHHS tried to set up visits for Mahdia to see the children in Lexington. On two separate occasions, DHHS arranged for lodging and transportation from Des Moines to Lexington, but Mahdia cancelled both visits. Mahdia did not give a reason for cancelling the first visit. She cancelled the second visit because she did not want to provide meals, drinks, activities, and toys during the visit and was angry that DHHS was not providing them. She was also upset that DHHS would not transport her teenage niece with her for the visits.

The second ICPC request also stalled in January 2021. One of Batista's sons had been in a severe car accident that required full-time care for him. When the Nebraska ICPC office reached out to Iowa to check on Mahdia's ICPC request, the Iowa office did not know if Batista wanted to continue the process. Degenhardt testified that Iowa was contracting a local agency to do a follow up with Batista.

Despite DHHS requesting the juvenile court adopt an alternative permanency goal of adoption, the court stated it would leave reunification as the sole permanency goal. It explained that some of the barriers to reunification were out of Mahdia's control and encouraged her to maintain the progress she was making, while visiting her children more.

*Mahdia Moves Around.*

The second ICPC request was eventually denied. The denial noted that it did not appear that Batista understood that she would be serving as a foster parent to the children. Other concerns that led to the denial were that Batista was caring for her adult children and a grandchild, and her house appeared to have an open-door policy. An open-door policy made it difficult to monitor and ensure necessary background checks for people staying in the house with the children.

Mahdia was fired from her employment for lack of attendance on March 5, 2021. Sometime in March, Mahdia moved out of Batista's house and left for Colorado. She claimed that she wanted to move out of Batista's house because there were too many people living there. Mahdia explained that she did not move to Colorado but was there for at least 3 weeks to get her driver's license because there were additional resources offered. Mahdia did not get her driver's license though. While she was there, it appeared to DHHS that she met with Nase, because she requested that they both have a visit with the children. This visit never occurred.

Mahdia moved back to Iowa for a brief period, and then went back to Colorado. When Mahdia returned to Iowa again, she moved in with her sister. She began looking for employment

again in Iowa. Despite Mahdia's extended period of unemployment, she had only visited the children twice since her move to Iowa between October 2020 and April 2021. There was one face-to-face visit with Mahdia and the children in March 2021. Visitation notes described Mahdia sleeping during the visit and she was on her phone a lot.

Mahdia sought another ICPC request, this time for her uncle and aunt that live in Sioux Falls, South Dakota. DHHS contacted her aunt and uncle, Shalal Koeale and Sambatu Kasala, who confirmed that they would be willing to care for Mahdia's children. Koeale told Degenhardt that they had provided for all of Mahdia's needs for a year after Galla's birth. The ICPC request was sent on May 7, 2021. But DHHS also noted concerns with the ICPC request because Mahdia had indicated she was not looking to move to South Dakota unless the children were there, which would impact how DHHS monitors and helps her. Mahdia also stated that if her children were not returning to her care, she would want Koeale and Kasala to be their adoptive parents.

At the review hearing in May 2021, DHHS requested the juvenile court change the permanency plan from reunification to adoption. Degenhardt testified that minimal progress had been made, Mahdia was still unemployed and dependent on her family members for support. The county court denied DHHS' request to adopt the sole permanency goal of adoption, and instead, adopted the primary permanency goal of adoption with a concurrent goal of reunification. It acknowledged that Mahdia had not made any real progress toward meeting her goals in the past three months and set another hearing for a 3-month review.

*Mahdia Moves to South Dakota.*

In June 2021, Mahdia began employment in Iowa. During the review period, from May to August, Mahdia visited the children once, which was the first time they had seen their mother in 3 months. According to the visit notes, Mahdia struggled to meet the children's needs, she was not attentive to them, and struggled with properly disciplining them. She had to be prompted to feed the children and to buckle them into their car seats. She also had difficulty meeting the children's emotional needs and was preoccupied on her phone throughout the visit.

Mahdia quit her job in August 2021, and moved to Sioux Falls, South Dakota. She moved in with a different uncle than Koeale. She explained that she moved to South Dakota after discussing it with her attorney, because she believed it would help her chances of seeing her children if they were to be placed with Koeale and Kasala.

For the August 2021 review hearing, DHHS again requested the juvenile court make adoption the sole permanency goal. The juvenile court retained the primary permanency goal of adoption with a concurrent goal of reunification. It also found that an exception applied to the State's obligation to file a motion to terminate parental rights under Neb. Rev. Stat. § 43-292.02(c) (Reissue 2016). It explained that although Mahdia was not making progress to rehabilitate herself or to reunite with her children, due to the cultural and language barriers, as well as the Covid-19 pandemic, it would give Mahdia some additional time. It caveated the exception by stating if Mahdia did not make vast changes during the next 3-month period, it would make a different finding.

*Mahdia Does Not Make Vast Changes.*

During the following 3-month period, Mahdia obtained employment in Minnesota and leased a new apartment in Sioux Falls. But she only visited the children for 3 days in September. During that visit, Mahdia provided the children with food and drinks, but the same concerns from previous visits lingered, namely Mahdia spent too much time on her phone and did not properly discipline the children. At one point in the visit, the visitation provider had to intervene when Galla tried to plug in the microwave, then had to correct Mahdia for trying to discipline Galla by locking him in the bathroom and holding the handle, so he could not get out.

It was also noted that Mahdia fell asleep while watching the children on two separate occasions. Mahdia had to be prompted throughout the visit to play with the children and get off her phone. When Yohanna asked Mahdia to play, the visitation provider suggested that Mahdia get down on the floor to play with him, but when Mahdia laid on the floor with him, she did not engage him and was mainly on her phone.

In September 2021, Mahdia started family support services again, but they were unsuccessful. Mahdia was given contact information for a parenting course and a resource for housing, but she refused to call them. When asked if she called housing services, Mahdia lashed out at the family support services provider and said she would not call them because she was not a beggar. Mahdia was also enrolled in child parent psychotherapy with Galla's therapist in Kearney, and accommodations were made for Mahdia to participate virtually. However, Mahdia attended only two sessions, as there were scheduling issues, and Mahdia also missed one of the sessions. To encourage visits with the children, DHHS sent Mahdia's employer a letter detailing Mahdia's need to travel to Nebraska for visits and therapy, and despite the employer's approval, Mahdia did not feel comfortable missing any work to visit.

In October 2021, DHHS received confirmation that the ICPC request for Koeale and Kasala was approved. DHHS offered Koeale and Kasala transportation and lodging so they could visit the children; however, they did not visit until December. DHHS informed Koeale that if they took custody of the children, Mahdia could not live with them, and they would have to be the children's primary caregivers. Despite Koeale's confirmation, Degenhardt testified at the review hearing that the children had already been out of the home for 22 months, and Koeale and Kasala had indicated they had no relationship with the children, so there was not enough time to try and develop one just to give Mahdia more time to rehabilitate herself.

At the review hearing, Jessica Schlegelmilch, Galla's therapist, testified about Yohanna and Galla's individual therapy. She testified both children had been referred for therapy because they needed help with emotion regulation and to improve communicating their needs. Schlegelmilch was also working with Mahdia with child parent psychotherapy. She testified due to scheduling issues and Mahdia living in a different state, they were still in the foundation phase of her therapy; however, Yohanna and Galla had made significant progress. She also testified that one of the reasons Mahdia was still at the foundational phase was because Mahdia indicated she was not willing to talk about her experiences with Schlegelmilch, and she suggested Schlegelmilch request the information from her team.

The juvenile court approved DHHS' case plan with the sole permanency goal of adoption. It also stated it did not find an exception that would prevent the State from filing a motion to

terminate Mahdia's parental rights. It found that only slight progress had been made during the previous review period, and there was little progress made toward placing the children with Koeale and Kasala in South Dakota. It admitted that it understood there to be cultural and language barriers in the case, but Mahdia had not made substantial efforts toward unification.

*Termination Hearing.*

On February 18, 2022, the State moved to terminate Mahdia's parental rights. The State alleged Yohanna, Galla, and Arsema came within the meaning of Neb. Rev. Stat. § 43-292(6) and (7) (Reissue 2016). It explained that reasonable efforts to preserve and reunify the family had failed and Mahdia was provided reasonable opportunity to rehabilitate herself yet failed. Also, the children had been in out-of-home placement for at least 15 of the last 22 months.

At the termination hearing, Degenhardt summarized her experience working with Mahdia and reviewed the timeline of the case. She concluded that Mahdia had not met any of the metrics that DHHS uses to measure progress. She also refuted Mahdia's argument that DHHS required her to have her own housing, by stating the only requirement for housing was that it was safe and appropriate, and the real issue was Mahdia's ability to properly care for her children on her own. Mahdia's failure to visit the children face-to-face attributed to the biggest barrier to reunification, which was her inability to care for her children on her own.

Both Yohanna and Galla's therapists testified about the progress they have made in therapy, and how disruptive it would be for them to move homes, if their aunt and uncle adopted them. Both therapists discussed Yohanna and Galla's long-term needs. Both boys' long-term needs were to be in an environment that could provide routine and stability, where they could continue to develop secure attachment. The children's caregivers needed to be attuned to their emotions and able to pick up on cues to properly provide support and regulation.

Schlegelmilch testified about a visit with Koeale and Kasala when they visited the children in December 2021. She stated the meeting was to see how the children would react to Koeale and Kasala and introduce them to the emotional needs of the children. After discussing the children's needs, the children were brought in to meet their aunt and uncle but hid behind their therapists. Kasala could not recall the children's psychiatric needs at the termination hearing when asked to review Schlegelmilch's guidance.

The children's foster mother also testified at the termination hearing. She testified about the negative impact phone calls with Mahdia had on the children because Mahdia would not engage with them. She discussed all the activities the children were involved within the community. The boys had made significant progress since they were originally placed in their home. Arsema had been with the foster family since she was barely over a year old but is now walking and talking. She also discussed the efforts she and her husband were taking to learn about the Kunama culture, because if they were permitted to adopt the children, they could educate them on their heritage.

The juvenile court ultimately terminated Mahdia's parental rights. It found that statutory grounds existed for termination under § 43-292(6) and (7). It explained that the State had demonstrated by clear and convincing evidence that reasonable efforts to preserve and reunify the family under the direction of the court had failed to correct the conditions leading to the adjudication in this case. It also found that the children had been in out-of-home placement for at

least 15 of the last 22 months leading up to the motion to terminate. Lastly, it found that all the children were negatively impacted by the lack of permanency and stability in their life, and that it was in their best interests that Mahdia's parental rights be terminated. Mahdia appeals.

## ASSIGNMENTS OF ERROR

Mahdia assigns that the juvenile court erred in finding that (1) statutory grounds existed for the termination of her parental rights and (2) it was in the children's best interests to terminate her parental rights.

## STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the findings made by the juvenile court below. *In re Interest of Mateo L. et al*., 309 Neb. 565, 961 N.W.2d 516 (2021). However, when the evidence is in conflict, an appellate court may consider and give weight to the fact that the juvenile court observed the witnesses and accepted one version of the facts over another. *Id*.

## ANALYSIS

Termination of parental rights is a two-part inquiry. The juvenile court must find by clear and convincing evidence that one of the statutory grounds under § 43-292 is met and that termination is in the child's best interest. *In re Interest of Alec S*., 294 Neb. 784, 884 N.W.2d 701 (2016). There are 11 bases for parental termination under § 43-292. Only one must be met to terminate parental rights. *In re Interest of Mateo L. et al., supra*. Once one of the bases is met, the appellate court does not need to consider the sufficiency of evidence concerning the State's other bases for termination. *Id*. We agree with the juvenile court that there was sufficient evidence by a clear and convincing standard to terminate parental rights under § 43-292(7); thus, we do not reach the grounds for termination under § 43-292(6).

*Statutory Termination Under Subsection (7).*

Under § 43-292(7), a court may terminate parental rights if the children have been in out-of-home placement for at least 15 of the last 22 months. Section 43-292(7) operates mechanically, and unlike the other subsections of the statute, does not require the State to adduce evidence of any specific fault on behalf of the parent. *In re Interest of Artamis G. et al*., 29 Neb. App. 922, 962 N.W.2d 568 (2021). Under this subsection, the protection afforded to the parents' rights comes in the best interests step of the analysis. *Id*.

Here, the children were placed in respite care on June 19, 2020, and were officially removed from the home on June 30, 2020. The motion to terminate parental rights was filed February 18, 2022. Mahdia admits that the children were out of the home for 20 of the last 22 months at the time of the filing of the motion to terminate. Mahdia argues that the statutory timeline is merely a guideline that we should not consider given the unique challenges associated with this case. See *id*. Although there were unique challenges in this case, the statutory timeline is applied mechanically; thus, the statutory grounds for termination are met by Mahdia's own admission. See *id*.

*Best Interests and Unfitness.*

In addition to establishing statutory grounds for termination, the State must also show by clear and convincing evidence that termination is in the best interests of the child. *In re Interest of Mateo L. et al., supra*. Whereas statutory grounds are based on a parent's past conduct, the best interests inquiry focuses on the future well-being of the child. *Id*. Since the parent's right to raise their child is constitutionally protected, there is a rebuttable presumption that the best interests of the child is to have a relationship with their parent. *Id*. The State can overcome this presumption by showing that the parent is unfit. *Id*. Parental unfitness means a personal deficiency or capacity that has, or will, prevent the performance of a reasonable parental obligation, and caused, or will cause, a detriment to the child's well-being. *Id*.

Determining the best interests of a child for purposes of termination is a fact-bound inquiry. *Id*. And while both the children's best interests and parental unfitness are separate inquiries, each examines the same underlying facts. *In re Interest of Noah C*., 306 Neb. 359, 945 N.W.2d 143 (2020). In proceedings to terminate parental rights, the law does not require perfection of a parent; instead, courts should look for the parent's continued improvement in parenting skills and a beneficial relationship between parent and child. *In re Interest of Joseph S. et al*., 291 Neb. 953, 870 N.W.2d 141 (2015).

Mahdia did not satisfy any of her case plan goals. These goals were to provide safe and appropriate housing; to develop an understanding of her children's medical needs; to attain a better understanding of child development by providing age-appropriate learning opportunities and working with community providers; and develop a better understanding of her children's nutritional needs. Mahdia's failure to meet these goals, engage in services, and adequately parent her children evince how her conduct would be a detriment to her children's well-being and reveals her parental unfitness.

Mahdia did not demonstrate that she could consistently provide safe and appropriate housing. As Degenhardt emphasized at the termination hearing, there was no requirement that Mahdia live alone, only that the housing was safe and appropriate. The children were removed from the home the second time because Mahdia was unable to pay rent, was not working, had lost childcare services, and had lost electricity. Batista's home was never approved for the children because Batista did not understand the responsibility she was undertaking, and the open-door policy put the children's safety at risk. Although the ICPC request was granted for Koeale and Kasala by the time of its approval, uprooting the children after over a year in their foster home would have negatively impacted the progress they made. Even at the end of the case, Mahdia had her own housing, but stopped providing information to DHHS, so there was no indication if the apartment was safe and appropriate. Altogether, she never provided safe and appropriate housing for her children.

Mahdia never showed that she understood her children's medical needs. The children were placed in respite care in June 2020 because Mahdia did not understand how to administer Yohanna's medication. She stopped participating in family support services in August, which further precluded any opportunities to learn about proper medication for her children. And due to her lack of visitation, there were not many opportunities for her to show that she ever gained an understanding of what they needed.

Mahdia failed to show that she understood her children's developmental needs or nutritional needs. This inability is highlighted by her inconsistent visits and the lack of engagement she displayed during those visits. Throughout the 20 months the children were in out-of-home placement, Mahdia visited them face-to-face only 6 times. During those visits, Mahdia needed reminders to feed, watch, discipline, and play with her children. Even when prompted, Mahdia still did not act on these prompts, and was reported to be distracted on her phone throughout most of these visits. There were other times when she was reported to be sleeping during the visits as well.

Mahdia was offered multiple services throughout the duration of the case, yet she continually denied them or refused to put in the work necessary to secure them. At the beginning of the case, Mahdia did not receive subsidized childcare because she missed her appointment. She did not visit her children throughout the duration of the case, despite DHHS organizing lodging and transportation, and coordinating with her employer to ensure she would not face consequences for visiting them. She refused to participate in a mental health evaluation. At the termination hearing, she admitted that she refused to call the agency to sign up for parenting classes because if they wanted her in the class, they would call her.

Furthermore, Mahdia failed to rehabilitate herself in a reasonable amount of time. She stopped participating in family support services in August 2020, less than 2 months after her children were removed the second time. Degenhardt testified on multiple occasions that prior to discontinuing services Mahdia did not participate in family support services, except to raise grievances with the case's progression and chastise her family support team. Mahdia only resumed family support services in September 2021, after the juvenile court stated she needed to make drastic changes if she did not want the State to file a motion to terminate her parental rights. Even after resuming family support services, they were not successful, because Mahdia was not compliant.

Mahdia has shown that she is unfit because she has failed to rehabilitate herself, and has demonstrated that she cannot properly provide for her children. When a parent is unable or unwilling to rehabilitate themselves within a reasonable period of time, the child's best interests require termination of parental rights. *In re Interest of Leyton C. & Landyn C.*, 307 Neb. 529, 949 N.W.2d 773 (2020). Even considering Mahdia's progress she made before the last review hearing, last-minute attempts by parents to comply with rehabilitation plans do not prevent the termination of their parental rights. See *id.*

It is also in the children's best interests that Mahdia's parental rights be terminated. Both Yohanna and Galla's therapists testified to their need for stable and predictable environments, where their caregivers were attuned to their needs. Yet Mahdia has failed to show stability or predictability. Throughout the life of this case, she has traveled back and forth between four states, worked three different jobs, and regularly relied on outside support systems to provide stability. During extended periods of unemployment, Mahdia still would not visit the children. Mahdia acts erratically, as she never provided notice to DHHS before a move, and lost childcare, as well as two of her jobs, for inconsistent attendance. During visits, visitation providers had to prompt Mahdia to feed, watch, discipline, and play with her children. All these issues evince Mahdia's inability to provide that stable and predictable environment for the children that they need. Although she

showed some progress toward the end of the case, children should not be suspended in foster care while awaiting uncertain parental maturity. See *In re Interest of Leyton C. & Landyn C., supra*.

Mahdia argues that the juvenile court erred in finding that termination was in the best interests of the children because "even in cases where a parent is unable or unwilling to rehabilitate" themselves, termination may not be in the best interests of the child. Brief for appellant at 14. She also argues that the juvenile court should have given more weight to the children's unique cultural heritage.

Mahdia relies on *In re Interest of Heather G. et al.*, 12 Neb. App. 13, 664 N.W.2d 488 (2003), to support her contention that it is not in the children's best interests to terminate her parental rights despite her inability to rehabilitate herself. *In re Interest of Heather G. et al., supra*, distinguished from other cases where termination is more straight-forward because the children could gain permanency through adoption. For *Heather G.*, permanency through adoption was not a possibility, because the children at issue were all over the age of 12 and they had a close relationship with their parents. This court emphasized that the case was unique because of the parents' close relationship with their children, the parents' inability to rehabilitate themselves within a few years, and the lack of evidence to establish that breaking the bond between parent and child would be beneficial for the child. *In re Interest of Heather G. et al., supra.*

This case is distinguishable from *Heather G.* for two reasons. First, permanency is available to the children through adoption. The children have thrived in their foster care placement and made strides in therapy, and their foster parents have demonstrated they are willing to adopt them to offer them that permanency. Second, and more importantly, the children do not have a close relationship with Mahdia. Although visitation notes show that the children were excited to see Mahdia when she visited in September 2021, Mahdia has only seen them 6 times since she moved out of the Lexington house. During those visits, Mahdia had to be directed to watch the children and engage with them. It was noted at each visit she was distracted by her phone, and when directed to play with Yohanna, Mahdia still did not engage with him.

Mahdia is correct that the children's cultural heritage is important to the best interest's analysis. See Christine P. Costantakos, Juvenile Court Law and Practice § 5:14 at 355 (2020). But the children's unique cultural heritage alone cannot overcome Mahdia's failure to meet her case plan goals. The juvenile court provided Mahdia with additional time to rehabilitate herself because of the language and cultural barriers. It denied DHHS' suggestion to make adoption the sole permanency goal twice to allow Mahdia more time, which equated to an additional 6 months. Degenhardt testified throughout the case that the biggest barrier to reunification was Mahdia's ability to support her children. Furthermore, the children's foster mother testified that she and her husband were making an active effort to learn about the children's culture so they could educate the children about their cultural heritage.

Overall, Mahdia did not show that she could support herself or her children without substantial help from outside sources. She was not able to maintain employment or a residence for the children. She refused to work with her family support team and often tried to establish quid pro quos with them to get what she wanted instead of working with them. Mahdia lived in three different states during the pendency of this case, which attributed to few visits between her and her children. She was even given additional time by the juvenile court to account for the language and cultural barriers. Despite all that was provided, Mahdia could not make substantial progress

on her case plan goals. After our de novo review, we hold that it was in the children's best interests for Mahdia's parental rights to be terminated.

## CONCLUSION

For the foregoing reasons, we affirm the juvenile court's order.

AFFIRMED.